UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHELLEIGH L. BLAKE, RICHARD W. BLAKE, <br><br> Plaintiffs, <br><br> vs. <br><br> NSTAR ELECTRIC CORPORATION, JAMES A. KILEY CORPORATION, HUBBELL POWER SYSTEMS INC., A. B. CHANCE INC., and TEREX-TELELECT, INC., <br><br> Defendants, <br><br> vs. <br><br> JCR CONSTRUCTION CO., INC., <br><br> Third Party Defendant | Civ. A. No. 1:09-cv-10955-DPW <br><br> **REQUEST FOR ORAL ARGUMENT** |

## MEMORANDUM OF LAW IN SUPPORT OF NSTAR ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

This is an action in which Plaintiffs, Richard Blake ("Mr. Blake") and Shelleigh Kulig[1] ("Kulig") (collectively "Plaintiffs") allege that Mr. Blake was injured while installing electrical cutouts on an NSTAR utility pole located on Worcester Road in Natick, Massachusetts. At the time of the accident, Mr. Blake was employed by an independent contractor, JCR Construction Company ("JCR"), retained by NSTAR for purposes of implementing certain upgrades to its overhead distribution lines (the "Project"). In their Complaint, Plaintiffs advance five separate negligence theories against NSTAR. Specifically, Plaintiffs allege that NSTAR was negligent in:

---

[1] After filing this action, Richard Blake and the former Shelleigh Blake divorced. Both have since remarried. Shelleigh Blake is now known as Shelleigh Kulig.

(1) failing to request a police detail for the Project; (2) failing to properly supervise Mr. Blake and his co-workers during the course of the Project; (3) failing to set the recloser on its distribution line to "one shot" prior to the installation of the cutouts; (4) allegedly providing cutouts for the Project that it knew or should have known were defective; and (5) negligently failing to advise Mr. Blake that the cutouts used in the Project were defective.

As set forth in detail below, NSTAR is entitled to summary judgment on each of the Plaintiffs' negligence theories for the following reasons. First, prior to the start of the Project, JCR and NSTAR entered into an agreement that set forth the rights and responsibilities of the parties. Under the unambiguous terms of this agreement, JCR assumed sole responsibility for providing any necessary police details for the project. This same contract also provided that JCR was responsible for supervising and training its own employees and ensuring that all work performed on the project conformed to NSTAR's Safety Guidelines. With respect to NSTAR's alleged failure to set the recloser on its distribution line to "one shot", the undisputed evidence demonstrates that neither Mr. Blake nor anyone else affiliated with JCR ever requested to NSTAR that it set the line to "one shot". In the absence of such a request, NSTAR had no obligation to re-set its recloser in the circumstances of this case. Further, Plaintiffs have failed to provide any evidence that the cutouts that Mr. Blake was installing on the day of the accident were defective. Moreover, even if Plaintiffs were able to establish that the cutouts were somehow defective, Plaintiffs have failed to provide any evidence that NSTAR knew or should have known of any alleged defects in the cutouts prior to the time that Mr. Blake installed them. Finally, Plaintiffs are unable to offer competent expert testimony regarding the cause of

Plaintiff's accident.[2] For these reasons, the Court should enter summary judgment in NSTAR's favor on all counts contained in Plaintiffs' Complaint.

**UNDISPUTED FACTS**

I.    **The Overhead Upgrade Project**

In 2006, NSTAR decided to upgrade its overhead distribution lines. Due to the scope of the work involved, NSTAR determined that it was necessary to retain a third-party contractor to assist it in implementing this upgrade project. Toward this end, on January 4, 2006, NSTAR issued "Request for Proposal #1264 Acton Circuit 433-H5 Overhead Upgrades" in the area of Natick, Massachusetts (the "RFP").[3] Statement of Undisputed Material Facts, ¶1 ("SMF, ¶X"). The RFP identified the work to be performed which included installing overhead cutouts,[4] replacing cutouts, and conducting other overhead electric work. SMF, ¶2.

Under the terms of the RFP, the contractor (JCR) was responsible for providing "all labor, *supervision*, tools, vehicles and equipment to ensure the safety of personnel and existing operating electrical systems." SMF, ¶3 (emphasis supplied). The RFP also made it clear that the contractor would be responsible for providing any necessary police details. *Id.* Specifically, the RFP provided in pertinent part: "Police details: - The contractor will be responsible for the coordination, costs and payment of police details necessary to comply with state and local requirements." *Id.* The RFP further required that: "All work shall be performed in accordance with Current Construction Standards, 'Safety Requirements for Contractors and Sub-contractors working on the NSTAR system' revised 11/1/05 and all applicable Federal and State Safety

---

[2] In the event that this Court denies NSTAR's motion, NSTAR intends to file pre-trial motions seeking to preclude the testimony of Plaintiff's expert witness on Daubert/Lanigan grounds, among others.
[3] The RFP refers to "Acton." Later documents strike out the word "Acton" and write in "Natick." There is no dispute that these are the true and correct RFP documents or that the work to be performed was in Natick, Massachusetts. SMF, ¶1.
[4] Cutouts are used on electrical distribution systems as switching devices to protect against faults and excessive current conditions. SMF, ¶2.

3

Standard (sic) including OSHA." SMF, ¶4; *see also* SMF, ¶12. Among other things, NSTAR's "Safety Rules" state: "It is the responsibility of the Contractor to enforce these safety requirements with her/his own personnel . . . ." SMF, ¶4.

On January 9, 2006, JCR submitted a bid for the overhead upgrade project. SMF, ¶5. As part of the bidding process, JCR was required to acknowledge receipt of the bid documents, including the RFP and the Safety Rules. *Id.* On March 8, 2006, NSTAR awarded the contract to JCR. SMF, ¶6

## II. The Agreement Between JCR and NSTAR

On March 15, 2006, NSTAR and JCR executed a contract (the "Contract") "to cover requirements . . . outlined in [the RFP] and JCR['s] bid response." SMF, ¶7. The Contract required JCR to perform its work in conformance with the Safety Rules. *Id.* Because JCR had previously performed work on behalf of NSTAR, the parties agreed that "[t]he signed Terms & Conditions of Construction" already on file at NSTAR governed the contract ("Terms & Conditions"). *Id..* Together, the Contract, Terms & Conditions, Safety Rules, and RFP formed the entire agreement between JCR and NSTAR with respect to the overhead line project. *Id.*

Among other things, the Terms and Conditions provided that JCR was solely responsible for supervising its own employees. For example, Section 39 of the Terms and Conditions entitled "Independent Contractor" provides as follows:

> The parties intend that the relationship of the Company to the Contractor [JCR] be that of "owner and independent contractor." *The contractor shall have direct control and supervision of its employees and subcontractors who shall not be considered employees or agents of the Company for any purpose.*

SMF, ¶8 (emphasis supplied). Section 12 of the Terms and Conditions further states that:

> *All services shall be performed under the general supervision and direction of Contractor in regards to time, order manner, materials and in accordance with this contract.* The Contractor shall furnish a competent supervisor to supervise the prosecution of the work

4

and such person shall not be changed during the performance of the work, except with the consent of the company. The supervisor shall have full authority to act for the Contractor in all matters affecting the progress and proper execution of the work, and all directions given to such supervisor shall be binding on the Contractor.

*Id.* (emphasis supplied); *see also id.* (JCR admits that it agreed to this provision).

### III. JCR Confirms That It Was Solely Responsible for Providing Any Necessary Police Details for the Project

During the course of discovery in this matter, multiple JCR employees, including its President and Rule 30(b)(6) designee, Joseph Reed, confirmed that JCR was solely responsible for providing any necessary police details for the project. SMF, ¶9. Indeed, in his deposition, Mr. Reed left no doubt regarding which entity was responsible for coordinating police details: "Q. Is it fair to say that to the extent police detail was required for this particular project, it was JCR's responsibility to obtain such a police detail? A. That's correct." *Id.* Cecil Bateman, JCR's foreman and Blake's immediate supervisor on the project, agreed that, to the extent that a police detail was necessary, he would have been the individual responsible for requesting such a detail. SMF, ¶10. "Q. "[I]f a police detail was needed for work on this project, JCR would be responsible for arranging that and for paying for that? A. Yes. I believe so." *Id.* Bateman further testified: "Q. [W]ould it have been your job to call for the police detail or Mr. Blake's? A. It would be mine." *Id.*

Mr. Blake himself confirmed that Bateman was the individual responsible for arranging any necessary police details. SMF, ¶11. "Q. What was your understanding of who was responsible for having a police detail at the job site? A. Cecile (sic) Bateman. He has to call for them. Q. As the supervisor for JCR? A. Yes." *Id.*[5]

---

[5] Plaintiffs' own expert (Brian Vandal) acknowledged that NSTAR was not responsible for arranging for a police detail on the day in question:

**IV. JCR Confirms That It Was Solely Responsible for Supervising Its Own Employees**

During the course of his deposition, JCR's 30(b)(6) designee also affirmed that NSTAR had no responsibility for supervising JCR's employees, including Mr. Blake. Specifically, with respect to the supervision issue, Mr. Reed testified as follows:

> Q. So, in this particular case JCR agreed and committed to the proposition that it would be responsible for not only providing the labor for the project but for supervising the individuals who were working on the project; correct?
>
> A. Correct.

SMF, ¶12. JCR also represented to NSTAR that all of its employees were properly trained and familiar with NSTAR's safety procedures. SMF, ¶12. And, Mr. Reed affirmed that Mr. Blake, specifically, was an experienced, trained lineman with who had installed hundreds of cutouts prior to the accident in question. SMF, ¶12.[6]

**V. Mr. Blake's Lineman Experience**

It is beyond dispute that, at the time of the accident, Mr. Blake was a highly trained, experienced lineman. Specifically, his career as a lineman began in 1997 when he completed a certificate program in electrical lineman basic apprentice training at "line school" located at

---

> Q. Is it still your opinion as set forth in your Report, that NSTAR was negligent in failing to obtain a police detail?
> A. No.
> Q. I just want to be clear. That's not – it is no longer your opinion that NSTAR was negligent in failing to obtain a police detail, correct?
> A. Yes.

SMF, ¶26

[6] Plaintiffs' expert also admitted that NSTAR was not obligated to have a representative onsite during JCR's work.

> Q. Mr. Kendall asked you whether it was necessary for NSTAR to have a supervisor on site watching at all the different poles and these workers installing the cutouts, correct, he asked you that?
> A. Yes.
> Q. I think your testimony was that NSTAR, in your opinion, NSTAR was not required to do that, correct?
> A. That's my opinion.

SMF, ¶27.

Sheppard Air Force Base in Texas while in the Army Reserve. SMF, ¶23. For the next seven months while on active duty, Mr. Blake performed electrical line work. *Id.* Mr. Blake also performed electrical line work for the Army Reserve during the succeeding nine years each time he reported for required monthly duty and annual three to four week tours. *Id.* After a four year stint as a police officer, Mr. Blake began working fulltime as an electrical lineman for Hudson Light and Power.*Id.* In 2001, Mr. Blake joined JCR and worked fulltime as an electrical lineman for the next five years leading up to the accident. *Id.* By his own admission, prior to the accident, Mr. Blake had installed "hundreds, maybe thousands" of cutouts." *Id.*

## VI. Non-Recloser Requests

All NSTAR distribution lines are equipped with a recloser. SMF, ¶13. A recloser is a circuit breaker designed to automatically close the breaker after it has opened due to a fault. *Id.* Reclosers are used on overhead distribution systems for purposes of detecting and interrupting momentary faults. *Id.* Since many short-circuits on overhead lines clear themselves, a recloser improves service continuity by automatically restoring power to the line after a momentary fault. *Id.* If a fault is detected on an NSTAR distribution line, the recloser will automatically close the breaker three times before the line shuts down completely. *Id.* This is commonly referred to in the utility industry as setting the line to "three shots." *Id.* This practice is based on the presumption that most faults result from benign causes such as a squirrel walking across the line. *Id.* After the third fault, it is presumed that the cause of the fault is more serious, and the line shuts down completely. *Id.*

In certain circumstances, NSTAR employees and/or outside contractors will request that NSTAR set its distribution line to "one shot" (a "non-recloser request"). SMF, ¶14. When the recloser is set to "one shot", the line will shut down completely after the initial fault. *Id.* In order

for NSTAR to honor a non-recloser request, it requires advance notice from the employee/contractor seeking the non-recloser. *Id.* Otherwise, NSTAR would have no way of knowing which the thousands of reclosers on its system needs to be reset to "one shot".

## VII. The Accident

On June 6, 2006, Blake was working as the leader of a JCR crew charged with, among other things, installing electrical cutouts on utility poles located on Worcester Road (Route 9) in Natick, Massachusetts. SMF, ¶15. It is undisputed that neither Mr. Blake nor anyone else affiliated with JCR ever requested a police detail prior to beginning work on the day of the accident. SMF, ¶16. With regard to this issue, Mr. Blake testified: "Q. Did you ever speak with the Natick Police or any other police department about a police detail? A. I'm not the one that does that. Q. Who is the person who should do that? A. Cecil Bateman. Q. Did you witness Cecil Bateman asking the Natick Police for a police detail. A. No." *Id.* Mr. Bateman confirmed that he never requested a police detail from the Natick police, nor did he believe that a police detail was necessary. SMF, ¶17.

It is also beyond dispute that neither Mr. Blake nor anyone else associated with JCR ever requested that NSTAR set its recloser to one shot prior to beginning work on the day of the accident. Blake testified:

> Q. Did you ask for the recloser to be set to one shot?
>
> A. To Cecil Bateman, yes.
>
> Q. Did you ask NSTAR?
>
> A. I'm not the one that asks; Cecil Bateman is.
>
> Q. Okay. Did you witness, see Cecil Bateman asking NSTAR that the recloser be set to one shot?
>
> A. No.

8

> Q. Did you witness NSTAR telling Cecil Bateman that the recloser would not be set to one shot?
>
> A. No.
>
> . . .
>
> Q. Did you witness anyone having a conversation where someone refused to set the recloser to one shot?
>
> A. No.

SMF, ¶18. During the course of his deposition, Bateman confirmed that he never requested that NSTAR set its recloser to "one shot" nor did he have any memory of speaking to Mr. Blake about this issue. SMF, ¶19. He further confirmed that a non-recloser request was not necessary under the circumstances. *Id.* JCR also admitted that the job being performed by Mr. Blake on the day of the accident was straightforward and routine and did not necessarily require resetting the recloser. *Id.*

Throughout the course of the project, JCR's crews worked for weeks on hundreds of poles controlled by numerous reclosers spread throughout the service area. SMF, ¶20. Further, because the contract provided that JCR was responsible for determining the scheduling of all work performed under the agreement, in the event JCR wished for a recloser to be set to "one shot", JCR was required to issue a non-recloser request to NSTAR, which JCR admitted was the appropriate procedure. *Id.* Otherwise, NSTAR would have no way of knowing which of its thousands of reclosers needed to be set to "one shot." *Id.* NSTAR has confirmed that it did not receive any non-recloser request from JCR on the day of the accident. SMF, ¶21.

Following their morning meeting, Mr. Blake's crew placed their aerial trucks on the shoulder of the road. SMF, ¶22. Blake installed the outside cutout first. *Id.* He then proceeded to install the center cutout. *Id.* After completing the installation of the center cutout, Mr. Blake

began removing the energized solid tap that was being replaced by the cutout. *Id.* At that point, Mr. Blake claims that the door on one of the cutouts swung open resulting in an arc flash. *Id.* According to Mr. Blake, this arc flash came into contact with a piece of exposed metal on the bucket truck and subsequently struck Blake in the face and side. *Id.* Following the initial arc flash, Mr. Blake claims that the line re-energized, thereby resulting in a second flash which struck Mr. Blake in the side, leg, and groin. *Id.* Mr. Blake was subsequently transported by ambulance to the Brigham & Women's Hospital where he received treatment for his injuries. *Id.*

## ARGUMENT

### I. Summary Judgment Standard

Summary judgment is appropriate where there are "no genuine disputes as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Children's Hosp. Corp. v. George Washington Univ.*, 750 F. Supp. 2d 239, 245 (D. Mass. 2010) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). A fact is material if it "has the potential of affecting the outcome of the case." *Scott v. Vt. Mut. Life Ins. Co.*, 2011 WL 4436984 at *6 (D. Mass. Sept. 22, 2011) (quoting *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)). The party moving for summary judgment bears the initial burden of "averring an absence of evidence" to support the non-moving party's case. *Strahm v. WSI Corp*, No. 91-12849-S, 1993 WL 540566, at *1 (D. Mass. May 14, 1993) (internal quotes omitted). The non-moving party must then proffer evidence to show a "sufficient disagreement to require submission to a jury." *Id.* (internal quotes omitted). Summary judgment is appropriate where, as here, the "non-moving party rests merely

upon conclusory allegations, improbable inferences, and unsupported speculation." *Id.* (internal quotes omitted).

## II. The Negligence Standard

In order to prevail on their negligence claims, Plaintiffs must satisfy the following four elements: (1) a legal duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; (3) causation; and (4) actual loss by the plaintiff. *Delaney v. Reynolds*, 63 Mass. App. Ct. 239, 241 (2005). "Summary judgment . . . is appropriate if a plaintiff has no reasonable prospect of proving one or more of the elements of his claim." *Lopez v. Equity Office Management, LLC*, 597 F. Supp. 2d 189, 192 (D. Mass. 2009) (granting summary judgment for building management company where its contractor's employees were injured and sued the management company) (citing *Hebert v. Enos*, 60 Mass. App. Ct. 817, 820-21 (2004) and *Kent v. Commonwealth*, 437 Mass. 312, 320, (2002)); *see also Glick v. Prince Italian Foods of Saugus*, 25 Mass. App. Ct. 901, 902 (1987) (negligence questions may be decided as a matter of law "where no rational view of the evidence would warrant a finding of negligence."); Roderick *v. Brandy Hill Co.*, 36 Mass. App. Ct. 948, 949 (1994) (same).

## III. The Unambiguous Language of the Contract Between NSTAR and JCR Provides That JCR Was Solely Responsible For Providing Any Necessary Police Details for The Project

The unambiguous language of the contract between NSTAR and JCR placed responsibility for securing any necessary police details solely on JCR and therefore NSTAR is entitled to summary judgment on this issue. The interpretation of a contract is a question of law that is appropriate for determination at the summary judgment stage. *Seaco Ins. Co. v. Barbosa*, 435 Mass. 772, 779 (2002); *Hiller v. Submarine Signal Co.*, 325 Mass. 546, 549-50 (1950); *see also Edmonds v. U.S.*, 642 F.2d 877, 881 (1st Cir. 1981) (construing Mass. law). If the contract is

unambiguous, it must be enforced according to its terms. *Schwanbeck v. Federal-Mogul Corp.*, 412 Mass. 703, 706 (1992). Where a contract specifically places a duty solely on one contracting party, the other party cannot be held liable for failure to meet the same duty. *Kelleher v. Brandeis Univ.*, 2008 WL 1932096, at *3-4 (Mass. Super. Ct. April 24, 2008) (granting summary judgment to owner of project because contract placed safety and supervision duties on contractor, where injured employee of contractor sued owner for failure to supervise and maintain safe work site); *see Fisher v. M. Spinelli & Sons Co., Inc.*, 1999 WL 165674, *3-4 (Mass. Super. Ct. Feb. 9, 1999) (granting summary judgment where "[t]he contract documents placed sole responsibility for worker safety on" another party).

In their Complaint, Plaintiffs allege that NSTAR "negligently fail[ed] to ensure that a safety police detail was hired by its contractor." Plaintiffs' allegations in this regard must fail for a number of reasons. First, as set forth above, the unambiguous terms of the Contract between NSTAR and JCR provide that JCR was solely responsible for coordinating any necessary police details for the Project. "The contractor will be responsible for the coordination, costs and payment of police details . . . ." SMF, ¶3. JCR's 30(b)(6) designee confirmed this delegation of responsibility in his deposition testimony. SMF, ¶9. Indeed, Blake himself admitted that his supervisor (Cecil Bateman) was charged with coordinating any necessary police details for the project . SMF, ¶11.

Finally, in his deposition, Plaintiffs' expert witness admitted that NSTAR was not required to obtain a police detail on the day of the accident. Because JCR was solely responsible

for securing any necessary police details for the project, NSTAR cannot be held liable for failure to obtain a police detail on the day of the accident.[7]

### IV. JCR Was Solely Responsible for Supervising Its Own Employees

NSTAR is entitled to summary judgment on Plaintiffs' negligent supervision claim because the unambiguous language of the Agreement provides that JCR was solely responsible for supervising its own employees, including Mr. Blake. *Foley v. Rust Intern.*, 901 F.2d 183, 183-84 (1st Cir. 1990) (affirming judgment notwithstanding the verdict that contract shifted supervision and safety duties to subcontractor under Mass. law); *see Kelleher*, 2008 WL 1932096, at *3-4; *see also Lopez*, 597 F. Supp. 2d at 192-95 (granting summary judgment and citing *Foley*, 901 F.2d at 183). Under Massachusetts law, NSTAR had the right to delegate supervisory safety duties to JCR. *Diodato v. Grove Mfg. Co., Inc.*, 1991 WL 182178, *2 (D. Mass. Aug. 29, 1991) (citing *Poirier v. Town of Plymouth*, 374 Mass. 206, 228 (1978)).

Here, the relevant contract charged JCR with providing "all labor, supervision . . . to ensure the safety of personnel and existing operating electrical systems." SMF, ¶7. The agreement further provided that the work be performed "under the general supervision and direction" of JCR, and that JCR "shall have direct control and supervision of its employees." SMF, ¶8. The agreement also provided that JCR had "the responsibility . . . to enforce [the] safety requirements with his/her own personnel . . . ." SMF, ¶4. Thus, it is beyond dispute that JCR was contractually obligated to supervise its own employees and ensure that all safety standards were complied with. *See Foley*, 901 F.2d at 183-84; *Kelleher*, 2008 WL 1932096, at *3-4; *see also Lopez*, 597 F. Supp. 2d at 192-95. Further, JCR, through its 30(b)(6) designee, confirmed that it was JCR who was solely responsible for supervising its own employees and

---

[7]It is undisputed that neither Blake nor his supervisor ever requested a police detail on the day of the accident. SMF, ¶¶10, 16, 17. Moreover, Plaintiff has failed to provide any evidence that the lack of a police detail contributed in any way to his accident.

13

ensuring that they complied with NSTAR's Safety Rules. SMF, ¶12; s*ee Kelleher*, 2008 WL 1932096, at *3-4. Under the circumstances, NSTAR cannot be held liable for breaching a duty that was expressly delegated to JCR.

V. **NSTAR Cannot Be Liable for a Failure to Reset Its Recloser to One Shot Because JCR Never Made A Non-Recloser Request to NSTAR**

In their Complaint, Plaintiffs allege that NSTAR was negligent in "failing to authorize the reclosure of the transmission line while Plaintiff was engaged in the inherently dangerous work of stinger and cutout replacement on electrical transmission wires." NSTAR is entitled to summary judgment on this claim because it is beyond dispute that no one on the JCR crew, including Mr. Blake, ever requested that NSTAR set the recloser to "one shot" prior to the accident. In the absence of such a request, NSTAR would have no way of knowing which of the numerous reclosers on its system needed to be reset. The requirement that JCR provide NSTAR with advance notice of a non-recloser request was particularly important in this case given that the project in question involved hundreds of poles located throughout NSTAR's service territory. In short, NSTAR cannot be held liable for failing to honor a request that was never made.

VI. **The Plaintiffs Have Offered No Evidence That the Cutouts Were Defective or That NSTAR Had Knowledge of Any Alleged Defects Prior to the Accident**

NSTAR cannot be held liable for any alleged defects in the cutouts installed by Mr. Blake on the day of the accident in question. Whether the cutout, a complex electrical device, was somehow defective, requires expert testimony because it is not within the scope of the average layperson's knowledge and requires expert testimony. *Esturban v. Mass. Bay Transp. Auth.*, 68 Mass. App. Ct. 911, 911 (2007) (affirming summary judgment for defendants where plaintiff did not designate expert testimony on whether an escalator was defective; elevator was a complex, technical piece of machinery for which design and operational requirements essential to safe

operation were not within scope of average person's knowledge); *see Pub Serv. Mut. Ins. V. Empire Comfort Syss., Inc.*, 573 F. Supp. 2d 372, 380 (D. Mass. 2008). "Rather, the precise nature of the alleged design defect and the causal relation between the defect and the plaintiff's accident [are] appropriately the subject of expert testimony." *Goffredo v. Mercedes-Benz Truck Co., Inc.*, 402 Mass. 97, 104 (1988). Yet Plaintiffs' expert admitted in his report and his deposition that: he did not know whether the cutout was defective. SMF, ¶28 ("I have observed photos of a cutout that exhibits carbon deposits from an electrical arc, but the photos do not permit adequate evaluation of what may have caused the initial arc event. I am unable to determine if cracking or other damage of the porcelain base is present."), ¶29 (A. "From these photos, even though they are not the clearest photos, I don't observe any cracks."). Thus, the Plaintiffs have offered no evidence, expert or otherwise, that the brand new cutouts installed on the day of the accident were defective.[8] In the absence of any expert testimony on this issue, the Plaintiffs cannot establish that the cutouts were defective, nor can they prove that Mr. Blake's accident was caused by any alleged defect in the cutouts. *Hochen v. Bobst Group, Inc.*, 290 F.3d 446, 451 (1st Cir. 2002) (affirming partial summary judgment and judgment at trial in favor of defendant where plaintiff could not offer relevant expert opinion testimony on defective product).

Further, even if the Plaintiffs were able to prove that the cutouts were defective, which they cannot, they have provided absolutely no evidence that NSTAR knew or should have known that the cutouts were defective prior to the time that Mr. Blake installed them. Thus, NSTAR did not have a duty to warn Mr. Blake and cannot be held liable for injury resulting from the alleged defects. *Glidden v. Maglio*, 430 Mass. 694, 697 n.4 (2000) ("plaintiffs also

---

[8] NSTAR did not manufacture, sell or distribute the cutouts in question and therefore cannot be held liable under any product liability theory.

produced no evidence tending to show that the defendant knew or should have known of any hazardous condition"); *Barry v. Beverly Enter.-Mass., Inc.*, 418 Mass. 590, 593 (1994) ("a defendant who did not have a reasonable opportunity to discover and remedy a hazardous condition-that is, a defendant who had no actual or constructive knowledge of the allegedly hazardous condition so that it could not reasonably remove, or warn the plaintiff of, the danger-cannot be found to have violated its duty of care"); *DuPont v. Mount Hope Machinery, Co.*, 3 Mass. App. Ct. 791, 791 (1975) (overturning denial of motion for directed verdict in favor plaintiff because owner of premises had no liability for injuries to employee of independent contractor, caused when elevator door fell on plaintiff, in absence of evidence that owner knew or should have known that pin which held door open was latently defective). In short, NSTAR cannot be held liable for failing to advise Mr. Blake of defects that it was not aware of.

## VII. Plaintiffs Lack Sufficient Expert Testimony Regarding the Cause of Plaintiff's Accident

In order to prevail on their claims against NSTAR, Plaintiff's must prove, not only that NSTAR was negligent, but also that NSTAR's negligence was the proximate cause of Plaintiffs' injuries. In order to satisfy their burden, Plaintiffs must proffer expert testimony establishing that NSTAR's alleged negligence was more probably than not the cause of Plaintiffs' injuries. *Esturban*, 68 Mass. App. Ct. at 911 ("Although the plaintiffs 'need not show the exact cause of the accident or exclude all other possible causes, [they] must show that there is a greater probability than not that the accident resulted from the defendant[s'] negligence.'") (quoting *Enrich v. Windmere Corp.*, 416 Mass. 83, 87 (1993)); *see Pub Serv. Mut. Ins.*, 573 F. Supp. 2d at 380; *Mullins v. Pine Manor College*, 388 Mass. 47, 68 (1983); *Pucci v. Amherst Rest. Enterprises, Inc.*, 33 Mass. App. Ct. 779, 785 (1992). In the present case, Plaintiff's expert has offered two possible theories regarding the cause of Plaintiff's accident. Under the first theory,

16

Mr. Blake was in the process of removing the hard tap from the middle phase lateral while holding the energized end of the tap in one hand. SMF, ¶24. He then attempted to remove the other end of the tap from the main line. During this attempt, the energized tap end made contact with the top of the outside phase cutout, thereby resulting in a "cross-phase" event and associated arc flash. *Id.*

Under the second causation theory offered by Plaintiff's expert, the accident occurred when the outside-phase cutout arm inexplicably dropped down and made contact with exposed metal on the boom lift, thus energizing the metal boom lift and causing electrical current to travel up through the insulated fiberglass covered controls and then into the energized load side connector in the hand of the Plaintiff. SMF, ¶24. Significantly, Plaintiff's expert was unable to state which of these two possible causation theories was more likely than the other:

> Q. Are those two possibilities equal in your mind, in your opinion?
>
> A. Yes.
>
> …
>
> Q. Those two possibilities were equally probable in your opinion?
>
> A. Yes.

SMF, ¶25.

Because Plaintiffs' expert is unable to establish the likely cause of Plaintiff's accident, Plaintiffs cannot satisfy their burden at trial. *Makuc v. Amer. Honda Motor Co., Inc.,* 835 F.2d 389, 392 (1st Cir. 1987) (requiring expert testimony on causation where accident allegedly occurred due to defective car axle); *Glidden v. Maglio*, 430 Mass. 694, 696 (2000) (summary judgment warranted where there is no evidence of causation); *Goffredo*, 402 Mass. at 104; *Foley v. Kibrick*, 12 Mass. App. Ct. 382, 385 (1981) ("where the causation between an accident and the resulting physical or psychological ramifications is not a matter of common knowledge, the

proof must rest on expert [] testimony."). "Lacking expert testimony, other possible causes of the [accident] [are] not sufficiently eliminated." *Enrich*, 416 Mass. at 87. Plaintiffs cannot simply rely on "conclusory allegations, improbable inferences, and unsupported speculation." *Strahm*, 1993 WL 540566, at *1. Thus, because Plaintiffs are unable to establish that Mr. Blake's injuries were caused by any alleged negligence on the part of NSTAR, the Court should grant summary judgment in favor of NSTAR on all counts.

**VIII. NSTAR Is Entitled To Summary Judgment On Plaintiffs' Loss Of Spousal Society and Consortium Claim**

Plaintiffs' consortium and spousal society claims against NSTAR are predicated on the existence of a valid claim of negligence against NSTAR. Because NSTAR is entitled to summary judgment on the underlying negligence claims, it is entitled to summary judgment on the Plaintiffs' consortium claims as well.

## CONCLUSION

For the foregoing reasons, defendant NSTAR Electric Company is entitled to summary judgment on all counts.

Respectfully submitted,

NSTAR ELECTRIC COMPANY
By its attorneys,

/s/ Daniel Navisky
Michael R. Perry (BBO # 555300)
Daniel Navisky (BBO # 670453)
MURPHY & KING
Professional Corporation
One Beacon Street
Boston, MA 02108
Tel: (617) 423-0400
mrp@murphyking.com
DATED: February 15, 2013                dpn@murphyking.com

**CERTIFICATE OF SERVICE**

      I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants on February 15, 2013.

                                              /s/ Daniel Navisky
                                              Daniel Navisky

Date:   February 15, 2013

*644361*