UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHELLEIGH L. BLAKE, and | ) | |
| RICHARD W. BLAKE, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | 09-10955-DPW |
| | ) | |
| v. | ) | |
| | ) | |
| NSTAR ELECTRIC CORPORATION, | ) | |
| Defendant/Third Party Plaintiff | ) | |
| JAMES A. KILEY CORPORATION, | ) | |
| HUBBELL POWER SYSTEMS, INC., | ) | |
| A.B. CHANCE, INC., | ) | |
| TEREX CORPORATION, | ) | |
| TEREX UTILITIES, INC., and | ) | |
| TEREX-TELELECT, INC., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JCR CONSTRUCTION CO., INC., | ) | |
| | ) | |
| Third Party Defendant. | ) | |

MEMORANDUM
September 20, 2013

Attorney Richard Kendall initiated this demanding products liability action in 2009 on behalf of his clients against multiple defendants.  Over a period of four years, Mr. Kendall, who has been challenged by a series of medical issues, proved unable to meet the demands of the litigation despite multiple scheduling accommodations provided by the court.  He was unwilling or unable either to engage, or to transfer the case to, other counsel who would reliably be able to prosecute the matter.

-1-

At this point, I confront a record in which Mr. Kendall has mounted on behalf of the plaintiffs a virtually non-existent opposition to defendants' motions for summary judgment.  Having extended every reasonable accommodation - and more - to plaintiffs, I now must address the record before me.  Doing so in a searching fashion designed to assure that the neglect of plaintiffs' counsel has not obscured some merit to plaintiffs' case, I conclude that summary judgment should be granted on this record to the several defendants.

Given the wholesale and sustained neglect of this case by Mr. Kendall, I conclude I should also refer the file to Massachusetts Bar Counsel for review to determine whether professional discipline is appropriate regarding counsel who manifestly did not provide competent, prompt, and diligent services to his client and consequently obstructed the orderly process of the adversary system.  To be sure, I specifically inquired of the lead plaintiff, Mr. Blake, earlier this year - after Mr. Kendall's pattern of subcompetent, dilatory, and neglectful conduct of this proceeding had become well established - regarding his satisfaction with Mr. Kendall's services.  I was informed by Mr. Blake that he wished to continue with Mr. Kendall.  I am not, however, satisfied that the views of a vulnerable lay client should be determinative on a question of professional discipline.  Rather, the course of this matter

provides a basis for review by the state's bar disciplinary apparatus to determine if action is necessary.[1]

## I. TRAVEL OF THE CASE

### A. Factual Background

On June 6, 2006, Richard Blake sustained serious injuries from two electrical explosions, also known as "arc flashes," that occurred while he was maintaining a power line.  Blake and his coworker Timothy Dugan, both employees of JCR Construction Company, were tasked with installing three porcelain fuse "cutouts," devices designed to protect transformers from power surges, on an electrical pole in Natick.  Dugan installed the "phase I" cutout while Blake installed the "phase III" cutout. The explosions occurred after the phase I and III installations were complete, while Blake was working on the "phase II" or "middle" cutout.

---

[1] While I make this reference pursuant to Local Rule 83.6(5)(A) of this court, it is my intention that should Bar Counsel determine to pursue disciplinary proceedings such proceedings should take place in the state system rather than being initiated as an original matter in this court.  Mr. Kendall's conduct raises a general concern about his capacity to function as a Massachusetts lawyer.  The outcome of this litigation can stand as the full resolution of his neglect in this matter in this court.  Moreover, it is apparent that the conduct of disciplinary proceedings as original matters in this court can add a further layer of awkwardness and delay, see In re Auerhahn, 724 F.3d 103 (1st Cir. 2013) with outcomes that may in the end differ between federal and state discipline.  See In re Griffith, 800 N.E.2d 259 (Mass. 2003).

Nstar had contracted with JCR Construction to install the cutouts, which were designed and manufactured by Hubbell Power and its subsidiary A.B. Chance.  To reach the cutouts, Blake rode in the bucket of an aerial lift attached to a truck, all of which were designed and manufactured, in various respects, by Terex-Telelect and James Kiley Corporation.

**B. Procedural Background**

Plaintiffs brought this action on June 5, 2009, seeking to hold Nstar liable for negligent conduct in organizing the cutout-installation project, and to hold the remaining defendants liable for negligent design of their respective products.  In addition to Richard Blake's direct claims for relief, his wife, Shelleigh Blake, is also a plaintiff asserting a derivative claim for loss of consortium.

Following the pattern of neglectful conduct of the litigation by plaintiffs' counsel, recited more fully in Section I.C. *infra*, as a result of which I repeatedly extended deadlines to accommodate plaintiffs, I scheduled without opposition by plaintiffs the filing of summary judgment motions for February 14, 2013.  Plaintiff's neglected to oppose defendant's motions in a timely fashion and, after failing in an eleventh hour effort to obtain yet another continuance, made a belated submission following the summary judgment hearing on these motions.

**C.   *Conduct of the Litigation by Plaintiffs' Counsel***

More than a year after the case was filed, plaintiffs had
still failed to submit initial disclosures and had not responded
to certain initial discovery requests.  I was required to enter
an order on August 30, 2010 compelling the plaintiffs to provide
their initial disclosures and discovery responses.

Plaintiffs moved in September 2010 to extend the time for
discovery beyond the initially-set December 2010 deadline because
Mr. Kendall had suffered a traumatic injury.  At a hearing on
December 13, 2010, I was informed that Mr. Kendall had fallen off
his roof while cleaning gutters, sustained serious injuries, and
had spent and would spend a significant amount of time in the
hospital.  Mr. Kendall informed me through telephone
participation in a scheduling conference that a staph infection
might cause additional complications.  As a consequence, I made
adjustments in the discovery schedule to accommodate Kendall's
health condition.  While defendants were permitted to pursue
discovery from Mr. Blake's employer, JCR, I postponed setting a
revised comprehensive schedule for the case until a
status/scheduling conference set for April 14, 2011, in the
expectation that Mr. Kendall's health issues would be resolved by
that time or alternative arrangements would be made for the
representation of plaintiffs.  In addition, I allowed defendants
to subpoena medical records relevant to plaintiffs' injuries,

-5-

which had not been produced by the plaintiffs.  Although defendants were thus able to obtain the relevant medical records, plaintiffs apparently never disclosed a list of individuals with discoverable information or a formal computation of damages.

At the April 14, 2011 conference, I extended the discovery period to December 2011.  I again saw this as a reasonable accommodation in light of Mr. Kendall's health condition. Thereafter, however, a pattern emerged in which plaintiffs failed to make use of the additional time extended to pursue the litigation and then made last-minute requests for reprieve by further extension of the relevant deadlines.  On December 8, 2011, I extended the period for discovery again. And I once again addressed the issue of Kendall's health on May 21, 2012, extending the time for discovery and dispositive motions. However, I allowed the last extension only on the representation that Mark C. Thomas, Kendall's putative co-counsel, would file a formal appearance in the case.  Mr. Thomas thereupon filed an appearance as promised.

One might have expected that, having received one last reprieve as to scheduling and armed with the assistance of healthy co-counsel, Mr. Kendall could have arranged to get the case back on track.  But it was not to be.  Plaintiffs failed to make expert disclosures by the most-recently-extended deadline of August 20, 2012.  The defendants thereafter filed an initial

round of motions for summary judgment, primarily arguing that plaintiffs could not prevail without expert testimony.

On September 19, 2012, co-counsel Mr. Thomas filed a notice of withdrawal without leave of court in derogation of Local Rule 83.5.2, while the defendants' dispositive motions were pending in the case.  This effort to withdraw was undertaken despite my indication at the May 21 hearing that, due to concerns about Mr. Kendall's health and ability to prosecute the case effectively on his own, Mr. Thomas' presence in the case was critical.  At a hearing on September 28, 2012, at which neither Mr. Kendall nor Mr. Thomas appeared, I vacated Mr. Thomas' purported withdrawal. Thereafter, I issued a memorandum memorializing these events and ordered both of plaintiffs' counsel to appear at a summary judgment hearing set for November 9, 2012.  *Blake* v. *Nstar Elec. Corp.*, No. 09-10955, Order (D. Mass. Oct. 3, 2012).

On October 24, 2012, Plaintiffs requested an extension of time to file an expert report, and at last filed such a report on November 8, 2012, the day of the scheduled summary judgment hearing.  In keeping with my general policy of seeking to resolve contested cases on the merits after full development of the parties' contentions, I denied defendants' motions for summary judgment without prejudice and reset a schedule for dispositive motions.

-7-

Meanwhile, on January 24, 2013, I met with plaintiff Richard Blake himself, along with Mr. Kendall and Mr. Thomas.  After the travel of the case was reviewed in our discussion, Mr. Blake assured me that he wished to proceed with Mr. Kendall as his attorney on the new schedule.  On that representation and the representation that a new public service job for Mr. Thomas required him to withdraw, I permitted Mr. Thomas to withdraw from the case, leaving Mr. Kendall again the only plaintiffs' counsel of record in the case.

On February 14, 2013, defendants timely filed the summary judgment motions before me now.  Dkt. Nos. 127, 129, 134, 140. Plaintiffs, however, failed to oppose these motions by the March 1, 2013 deadline I had extended them.  On April 16, 2013, the day before the scheduled hearing on the motions for summary judgment, Mr. Kendall, on behalf of plaintiffs, filed a motion for extension of time to file oppositions to the summary judgment motions, and also moved to continue the scheduled hearing.

I declined to order a continuance and the hearing went forward as scheduled on April 17.  I made clear that I had been as accommodating as possible in scheduling matters, but that enough was enough.  I also informed attorney Mr. Kendall that I would be notifying the Board of Bar Overseers about his handling of this case.

Nevertheless, consistent with my policy of addressing the
pending summary judgment motions on their merits even without an
opposition, I requested supplemental briefing by May 1, 2013,
regarding the possibility that defendants might bear the burden
of proof as to causation under an "alternative liability" theory
not fully developed in the submissions.  I also allowed the
parties the opportunity to brief whether plaintiffs' failure
diligently to prosecute their claims constituted an independent
basis for dismissing the claims against defendants.

Shortly after midnight on May 2, 2013, plaintiffs filed a
memorandum, which Nstar then moved to strike to the extent it
addressed issues beyond "alternative liability."  Nstar not
unreasonably suggested that portions of plaintiffs' memorandum
served as a more general belated opposition to defendants'
motions for summary judgment, despite my earlier order declining
to extend plaintiffs extra time to file such an opposition.  I
will deny the motion to strike because I have, consistent with my
general policy, considered all of the materials submitted by the
parties up to the point I have issued my opinion.  On the record
as it stands, I nevertheless will grant defendants' motions for
summary judgment.

## II. STANDARD OF REVIEW

Fed. R. Civ. P. 56 "mandates the entry of summary judgment,
after adequate time for discovery and upon motion, against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). The question is whether, viewing the facts in the light most favorable to the nonmoving party, there is a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *Casas Office Machines, Inc.* v. *Mita Copystar Am., Inc.*, 42 F.3d 668, 684 (1st Cir. 1994).

Even when a party fails to oppose a motion for summary judgment, a "district court [remains] obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate." *Kelly* v. *United States*, 924 F.2d 355, 358 (1st Cir. 1991).

### III. MERITS

The question of causation is determinative of the summary judgment motions. In this section, I discuss as well other merits based grounds to grant summary judgment to the defendant, which are largely focused on negligence.

#### A. *Causation*

##### 1. Plaintiffs' Expert Testimony

According to plaintiffs' expert, electrical engineer Brian Vandal, the electrical arc flashes that injured Richard Blake were the result of [1] "contact of an energized utility line with

-10-

exposed conductive parts of the aerial life bucket and/or [2] a phase to phase contact from the jumper to the cutout and/or [3] arcing due to a failed cutout." While the first and third theories implicate the defendants, the second attributes the incident to Mr. Blake's own negligence. At his deposition, however, Mr. Vandal testified that he could not say to a reasonable degree of certainty which of the three was most probable.

Mr. Vandal eventually reduced his testimony to two alternative explanations for the explosions: (1) that there was a direct connection between the phase III cutout and the jumper cable Mr. Blake was holding while replacing the phase II cutout, or (2) that the phase III cutout arm dropped open and contacted a conductive section of the aerial lift. Only the latter theory implicates actionable conduct by the defendants.

In his deposition, Mr. Vandal initially testified it was "not probable" that Mr. Blake, while replacing the phase II cutout, stretched the jumper cable to touch the other phase. Rather, the latter theory, he said, was "more consistent" with Mr. Blake's account of the incident, wherein he had safely tucked the end of the jumper against the side of the bucket and noticed motion at the top of the pole just prior to the explosion. Later, however, Mr. Vandal testified that the two theories were equally possible.

## 2.  Inability to Prove Causation

All of the defendants argue that Vandal's inability to offer an opinion distinguishing the possible causes of the incident means plaintiffs cannot meet their burden of proving that defendants' negligence, if any, was a factual cause of Blake's injuries.  The defendants' argument is plainly well founded.

In my independent review of the submissions in advance of the motion hearings, however, I identified a theory which might have been helpful to plaintiffs.  Had plaintiffs filed a timely response, they might have sought to shift the burden of proof to defendants under an "alternative liability" theory:

> When the plaintiff sues all of multiple actors and proves that each engaged in tortious conduct that exposed the plaintiff to a risk of harm and that the tortious conduct of one or more of them caused the plaintiff's harm but the plaintiff cannot reasonably be expected to prove which actor or actors caused the harm, the burden of proof, including both production and persuasion, on factual causation is shifted to the defendants.

*See Restatement (Third) of Torts: Phys. & Emot. Harm* § 28(2) (2010).[2]  The "alternative liability" rule takes the position

---

[2] Section 28 of the Third Restatement is based on the *Restatement (Second) of Torts* § 433B(3), which in turn is based on the well-known case of *Summers* v. *Tice*, 199 P.2d 1 (Cal. 1948).  Although the "alternative liability" theory has never been explicitly endorsed by the Massachusetts Supreme Judicial Court, it has been applied by at least one lower court in the state.  *Russo* v. *Material Handling Specialties Co.*, 1995 WL 1146853, at *7-8 (Mass. Super. Aug. 29, 1995).  Other courts applying Massachusetts law have endorsed applying an "alternative liability" theory, but in those instances found burden-shifting unavailable because the plaintiff had failed to join all possible defendants.  *Domestic Loan & Inv. Bank* v.

that "as between [multiple] culpable defendants and an *innocent* plaintiff, it is preferable to put the risk of error on the culpable defendants" (emphasis added); the rule also assumes that the defendants will have better access to the relevant evidence. *Id.* cmt. g.  In order to satisfy myself that this theory would be fully developed and considered, I ordered further briefing after the April 17, 2013 hearing.

Consistent with plaintiffs' burden to prove that at least one of the various defendants caused Blake harm, plaintiffs must be able to rule out Blake's own negligence before the burden of proof shifts to the defendants.  *Cf. id.* rptrs. note o.  This is a burden plaintiffs do not meet on this record.  Of course, a jury could find credible Blake's own testimony regarding the secured position of the jumper cable.  *Cf. Vahey* v. *Sacia*, 126 Cal. App. 3d 171, 177 (1981) (instructing jury on alternative liability "in case they find that the plaintiff was innocent").  But Mr. Vandal conceded that Mr. Blake violated accepted industry practices by failing to use insulating safety blankets, which could have prevented the incident.  Given the inability to rule out Blake's negligence as a cause of his injury, and without - as will appear more fully below - expert testimony that any of the conduct by one or more of the defendants was a more probable

---

*Ernst*, 1996 WL 680080, at *3 (Mass. Super. Nov. 21, 1996); *Spencer* v. *Baxter Int'l, Inc.*, 163 F. Supp. 2d 74, 80-81 (D. Mass. 2001).

cause of the injury, plaintiffs are not entitled to shift to the defendants the burden of proof as to causation.  Mr. Vandal's equivocal testimony is not only fatal to plaintiffs' ability to meet their burden of proof as to causation, but also insufficient to permit burden-shifting under the theory of "alternative liability."

For this reason alone, all defendants are entitled to summary judgment based on plaintiffs' inability to establish factual causation.[3]

---

[3] I note that in their filings, plaintiffs complain that Mr. Vandal was unable to provide an opinion more favorable to their position due to spoliation of evidence.  For example, Mr. Vandal was not able to inspect the aerial lift because it was modified by Kiley at some point after the incident.  Spoliation, however, "does not include a fault-free destruction or loss of physical evidence." *Kippenhan* v. *Chaulk Servs., Inc.*, 697 N.E.2d 527, 530 (Mass. 1998).  Plaintiffs waited to file this action until the day before the statute of limitations would have run under Mass. Gen. Laws ch. 260, § 2A.  Evidence can only be preserved for so long in the absence of some notice of a need to do so.  Without more detail about the circumstances under which the lift was modified and the timing of that modification, I am not prepared to conclude that there was spoliation of evidence here, let alone spoliation that undermined Mr. Vandal's ability to render meaningful opinion.

In any event, even assuming the inability to examine the lift may somehow have hindered Mr. Vandal's ability to form opinions, plaintiffs cannot show negligent design, failure to warn, or breach of the implied warranty of fitness for particular purposes – all grounds independent of any need to inspect the particular lift at issue.  Thus, even improper modification of the lift would not allow plaintiffs to avoid summary judgment on their claims against Terex and Kiley, the entities whose design, manufacture, fabrication and distribution of the actual lift at issue in this case.

**B.  *Inability to Prove Negligence***

For the sake of completeness, I also observe that burden-shifting under the "alternative liability" rule is unavailable unless plaintiffs can establish some set of negligent defendants to whom the burden of proving causation may shift.  As I discuss below, there is insufficient evidence in the record to show that any of the defendants acted negligently.  And, of course, independent of the failure to establish causation, the inability to prove negligence on the part of any the defendants is in itself fatal to plaintiffs' claims.

1.  <u>Terex-Telelect and James Kiley Corporation</u>

In their claims for negligent design against Terex-Telelect ("Terex") and James Kiley Corporation ("Kiley"), plaintiffs argue that the presence of exposed metal on the aerial lift was unreasonably dangerous and was a cause of the explosions.

a.  *Terex - negligent design*.  Terex, which designed the bucket and lift, rightly maintains the lift was not unreasonably dangerous or defective merely because parts of the bucket were not insulated.  Terex emphasizes that the lift complied with the American National Standard for Vehicle-Mounted Elevating and Rotating Aerial Devices as a "Category C" device.  Although such a device would be inappropriate for use in a high-voltage environment, Mr. Vandal conceded that it was the application to which the lift was put, rather than the design of the lift

itself, that rendered the lift unreasonably dangerous.  The
choice of application was made by JRC.  There was no negligence
shown on this record by Tyrex.

    *b.  Kiley - negligent design*.  Kiley, meanwhile, had no role
in designing or manufacturing the boom and bucket.  Instead,
Kiley attached the pre-fabricated Terex lift to a service truck,
pursuant to JCR's specifications requesting a "Category C"
machine.  Kiley cannot be liable for building the truck with
attached Terex lift to JCR's specifications, where the requested
product was not "so glaringly or patently insufficient that an
ordinary prudent manufacturer would not follow them." *Hatch* v.
*Trail King Indus., Inc.*, 656 F.3d 59, 68 (1st Cir. 2011)
(internal quotation and citation omitted); *see generally id.* at
67-70.  As discussed above, the Terex lift may have been safe for
any number of uses, and JCR may have been able to take any number
of steps to ameliorate any danger in any portions of exposed
metal.  Accordingly, Kiley cannot be subject to liability merely
based on JCR's choice of a "Category C" lift.

    *c.  Failure to Warn.*  Although plaintiffs nominally brought
a claim only for negligent design, the Complaint suggests that
Terex and Kiley also breached a duty to warn of the dangers posed
by the lift.  The record establishes, however, that the lift bore
warnings about areas of exposed metal, which Vandal could not say
were inadequate and which Mr. Blake admitted he understood.

There is thus no indication that these defendants breached any duty to warn, or that any additional warnings would have reduced the likelihood of injury to Blake.

d. *Implied Warranty*. There is also some indication that plaintiffs meant to allege that Terex and/or Kiley breached the implied warranty of fitness for a particular purpose. The specter of the claim appeared at Mr. Vandal's deposition, where he testified that "the company providing this lift also has some responsibility to make sure that the contractor is purchasing the correct product for their application." However, a claim for breach of the implied warranty of fitness for a particular purpose was not pled in the complaint and could be dismissed on that ground alone.

Moreover, even if such a claim were legitimately pled, it would fail on the merits. Under Massachusetts law, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required *and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods*, there is unless excluded or modified . . . an implied warranty that the goods shall be fit for such purpose." Mass. Gen. Laws ch. 106, § 2-315 (emphasis added). Here, there is no evidence that JCR was relying on the skill or judgment of Kiley or Terex in selecting or furnishing the lift at issue, let alone that Kiley or Terex had reason to know of such

reliance.  To the contrary, Kiley knew this was not JCR's first experience with such equipment because Kiley had modified service trucks for JCR in the past.  Moreover, JCR provided Kiley with detailed specifications for the requested truck and lift.  "[W]here a buyer specifies the desired goods, in detail, to a seller, the buyer has not relied on the seller's skill and judgment in selecting those goods." *Commonwealth* v. *Johnson Insulation*, 682 N.E.2d 1323, 1327 (Mass. 1997).  Thus a claim for breach of the implied warranty of fitness for a particular purpose, even if properly pled, could not survive summary judgment on this record.

   *e. Expert Opinion.*  In any event, Mr. Vandal was not qualified to offer an opinion as to design defects in the aerial lift, or any failure to warn of danger.  Mr. Vandal is an electrical, not mechanical, engineer.  He has no experience in the design of aerial lifts, or with industry standards regarding aerial lifts.  Neither is there anything apparent in Vandal's education or background that would qualify him to opine on the proper design of aerial lifts.  Lacking competent expert testimony to assist the jury in navigating complex and technical issues involved in assessing the design of the aerial lift, plaintiffs cannot succeed on their claims for negligent design or failure to warn.  *Cf. Pub. Serv. Mut. Ins.* v. *Empire Comfort Sys., Inc.*, 573 F. Supp. 2d 372, 380 (D. Mass. 2008).

2.  Hubbell Power and A.B. Chance

In response to plaintiffs' claim of negligent design of the porcelain cutouts, Hubbell Power and A.B. Chance argue that Mr. Vandal was not qualified to opine on the subject and in any event was unable to identify a defect in the particular cutout at issue.

a. *Expert Opinion*.  Mr. Vandal did have some exposure to porcelain cutouts while working as an electrical distribution engineer from 1992 to 1995.  But beyond that, the extent of his ability to opine on cutout design appears limited.  Mr. Vandal lacks formal education regarding the cutouts and has not published on the topic of porcelain cutouts.  His opinion as to the allegedly faulty cutouts appears to have been based primarily on Mr. Blake's testimony, and on research conducted specifically for this case indicating that certain porcelain cutouts failed after five to seven years in service.  I find that Mr. Vandal's limited experience with cutouts makes his opinion testimony insufficiently reliable to be admissible.  Without competent expert testimony, plaintiffs cannot show that Hubbell and A.B. Chance acted negligently in designing porcelain cutouts.

b. *Negligent Design & Causation*.  In any event, Mr. Vandal's opinion would not allow plaintiffs' claim against Hubbell and A.B. Chance to survive summary judgment.  Although plaintiffs, through a properly qualified expert, arguably could

-19-

have created a genuine dispute as to negligent design, plaintiffs remain unable to show that any negligent design of the cutouts caused Blake's injuries--for reasons more specific than those already discussed in Part III.A *supra*.

Mr. Vandal apparently considers porcelain cutouts inferior to polymer cutouts because polymer cutouts are allegedly less likely to fail and have been widely available for years.  Whether Hubbell was negligent in failing to adopt the proposed alternative depends upon a variety of considerations.  Evaluating the adequacy of a product's design requires consideration of "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Back* v. *Wickes Corp.*, 964, 970 (Mass. 1978) (internal citations and quotation marks omitted).

Mr. Vandal, however, was unable to identify a defect in the particular cutout at issue, leaving plaintiffs unable to show that any negligent design of the cutouts caused Blake's injuries. Beyond his equivocation regarding causation as discussed in Part III.A *supra*, Vandal introduced more specific points of uncertainty as to causation based on negligent design of the cutout.  He admitted, for example, that he was not aware of

incidents in which a brand new cutout--like the phase III cutout
Blake had installed just prior to the incident--cracked or
failed.  Moreover, Mr. Vandal noted that the phase III cutout may
have detached because it cracked, symptomatic of negligent
design, or because Mr. Blake did not install it properly, again
implicating plaintiff's possible negligence.  A cracked cutout
could also result from the design flaw of inability to withstand
wear and tear or from damage in delivering the cutout to the
site, the latter possibility exculpating Hubbell.  With Mr.
Vandal apparently again unable to convert possibilities into
probabilities, plaintiffs cannot show that any negligence by
Hubbell or A.B. Chance caused Blake's injuries.

    Hubbell, for its part,  also presents testimony from Michael
Grisham--whom I credit as a qualified expert based on his fairly
extensive experience in the design, testing, and maintenance of
ceramic cutouts--that the phase III cutout was not even
manufactured by Hubbell.  Mr. Vandal could not offer an opinion
contradicting Mr. Grisham's.[4]  Thus the record, as it stands,

_____

    [4] Plaintiffs again complain about spoliation of evidence,
because the porcelain cutout at issue was not preserved.  As
discussed in Note 3 *supra*, however, I am not prepared to conclude
on this record that there was actionable spoliation of evidence,
given that plaintiffs have not provided evidence about the
context of the loss or destruction of the cutouts.
    In any event, this is not a case in which one party's expert
obtained an unfair advantage in examining the physical evidence
which was then destroyed before the other party's expert had an
opportunity to do the same.  *Cf. Fletcher* v. *Dorchester Mut. Ins.
Co.*, 773 N.E.2d 420, 426 (Mass. 2002) (testimony of only expert

establishes that Hubbell cannot be held accountable for the allegedly faulty cutout at issue.

### 3. Nstar

Plaintiffs allege a wide-ranging array of negligent behavior by Nstar, but none of these claims can survive summary judgment on this record.

*a. Police Detail.* Blake first faults Nstar for failing to request a police detail for the project. Without a police detail, Blake had to park the bucket truck in the shoulder of the road, which required him to extend the aerial lift at an angle that exposed the dangerous metal portion of the lift. But Nstar's request for proposal on the project specified that "[t]he contractor will be responsible for the coordination, costs and payment of police details necessary to comply with state and local requirements." JCR President Joseph Reed, as JCR's Rule 30(b)(6) designee, confirmed that JCR was responsible for obtaining police detail. Cecil Bateman, JCR's foreman and supervisor on this project, testified that it would have been his job to arrange for a police detail. The responsibility to obtain a police detail thus fell with JCR, and Blake cannot seek to hold Nstar vicariously liable for any negligence by JCR. *Vertentes* v.

---

with first-hand knowledge of evidence may be excluded); *Pub. Serv. Mut. Ins.* v. *Empire Comfort Sys., Inc.*, 573 F. Supp. 2d 372, 382 n.13 (D. Mass. 2008). Grisham, like Vandal, had an opportunity to examine only photographs of the cutout at issue, rather than the cutout itself.

*Barletta Co., Inc.*, 466 N.E.2d 500, 502 (Mass. 1984) (holding that "the duty owed by an employer of an independent contractor who is performing inherently dangerous work does not extend to the employees of the independent contractor").

    b. *Failure to Supervise*. Similarly flawed is Blake's allegation that Nstar failed adequately to supervise Blake and his co-workers during the project. Under its contract with Nstar, JCR was responsible for providing adequate supervision. Vicarious liability is unavailable. *Vertentes*, 466 N.E.2d at 502.

    c. *Recloser Settings*. Blake next argues Nstar negligently failed to set the electrical line recloser to "one shot"--meaning the line would have shut down completely after the initial fault. All agree that "one shot" reclosing would have prevented the second explosion. Blake testified that he asked his supervisor, Cecil Bateman, to request that Nstar set the recloser to "one shot." Bateman, however, testified that he did not recall speaking with Blake about the recloser for the project, that he did not believe changing the recloser settings was necessary for the project anyway, and that he never asked Nstar to set the recloser to "one shot." Without such a request, Nstar would have had no reason to change the recloser settings without a request from JCR. Any negligence on the part of JCR cannot be attributed to Nstar.

-23-

*d. Defective Cutouts*.   Finally, Blake faults Nstar for providing cutouts it knew would be defective and for failing to advise Blake that the cutouts were defective.   However, as discussed in Part III.B.2 *supra*, Blake cannot provide evidence that the cutouts were defective.   Moreover, there is no evidence in the record that Nstar knew or should have known that the cutouts were defective before Blake installed them.

## IV. FAILURE TO PROSECUTE

It is within my discretion to dismiss this case, in the alternative, for failure to prosecute.   *See generally* Fed. R. Civ. P. 41(b); *Diaz-Santos* v. *Dep't of Educ. of Com. of Puerto Rico*, 108 F. App'x 638, 640 (1st Cir. 2004).   Such a disposition prompts the additional question whether dismissal should be with prejudice.   As the First Circuit has explained:

> Dismissal with prejudice for failure to prosecute is appropriate in the face of extremely protracted inaction (measured in years), disobedience of court orders, ignorance of warnings, contumacious conduct, or some other aggravating circumstance. . . . [W]here the case is close, courts should prefer less severe sanctions that preserve the possibility of disposition on the merits.

*Pomales* v. *Celulares Telefonica, Inc.*, 342 F.3d 44, 48 (1st Cir. 2003) (internal citations and quotation marks omitted).

Given the considerations articulated in *Pomales*, the conduct of plaintiffs' counsel in this matter provides a prototype for the case in which dismissal with prejudice is appropriate.   After nearly four years, plaintiffs have done virtually nothing to

-24-

advance this case.  Despite several belatedly sought extensions
of discovery deadlines, plaintiffs have not issued a single
discovery request. Plaintiffs' counsel also routinely failed to
appear at depositions, despite adequate notice.  Most recently,
plaintiffs twice responded to defendants' motions for summary
judgment only with a plea for additional time made on the eve of
hearings on the motions.

Typically I would be reluctant to visit the sins of an
attorney on his clients, although the First Circuit has made
clear that such considerations are often "overborne by the nature
of the adversary system." *Damiani* v. *Rhode Island Hosp.*, 704
F.2d 12, 16 (1st Cir. 1983).  In any event, no such reluctance is
appropriate here.  In my colloquy with Richard Blake on January
24, 2013, he made clear that he was satisfied with the legal
services he was receiving and wished to proceed with attorney
Kendall.  Thus, even more than in the ordinary case, the failure
to prosecute here can be attributed not only to Mr. Kendall but
also to the plaintiffs themselves.  What effect Mr. Blake's
ratification of Kendall's services might have on a potential
malpractice suit or any professional discipline proceeding are
matters to be addressed in different fora.

The medical challenges Mr. Kendall has reported are entitled
to sympathetic consideration and over the more than four year
course of these proceedings, they have received it.  But the

nature of the adversary system requires consideration for his clients' adversaries who have been forced to await resolution of this case as a result of the failure of plaintiffs to prosecute the case with even a modicum of diligence.  It has been apparent for some time that Mr. Kendall has been unable to prosecute this case on behalf of plaintiffs.  Whether his refusal to withdraw or pass the matter on to other competent counsel – and plaintiffs' decision to maintain his representation – was the result of misplaced loyalty or some underlying economic considerations or both, the defendants cannot be held hostage to the plaintiffs' improvident choices regarding prosecution of this case.

As an alternative ground for disposition, I will dismiss this case with prejudice for want of prosecution.

## V.  CONCLUSION

For the reasons set forth more fully above, defendant Hubbell Power's motion to strike, Dkt. No. 160, is DENIED; defendants' motions for summary judgment, Dkt. Nos. 127, 129, 134, 140, and their motions to dismiss for want of prosecution, Dkt. Nos. 150 and 159, are GRANTED, and the Clerk is directed to enter a judgment for defendants in this case.  The Clerk is further directed to forward a copy of this Memorandum and Order to Bar Counsel.

/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE